1

2

3

4                          **UNITED STATES DISTRICT COURT**

5                         **NORTHERN DISTRICT OF CALIFORNIA**

6

7

8  **COMET ML INC**,                      Case No.: **4:25-CV-04088-YGR**

9                                          **ORDER GRANTING IN PART AND DENYING IN**
            Plaintiff,                    **PART MOTION FOR PRELIMINARY**
10                                         **INJUNCTION**
        v.
11                                         Re: Dkt. Nos. 19, 60, 61, 62, 63, & 71.
   **PERPLEXITY AI, INC.,**
12
            Defendant.
13

14        Plaintiff Comet ML Inc. ("CML") moves for a preliminary injunction enjoining the launch of

15  defendant Perplexity AI, Inc.'s ("Perplexity's") forthcoming web browser, whose name it alleges

16  infringes on its valid trademark.[1] The motion is fully briefed and the Court held a full day

17  evidentiary hearing on the matter on June 25, 2025. Having carefully considered the papers

18  submitted and the pleadings in this action, and for the reasons set forth below, the Court hereby

19  **GRANTS IN PART AND DENIES IN PART** the motion.[2]  In summary, the Court will allow the browser

20  itself to launch but enjoins all other activity pending trial.

21

22

23        [1] CML moved initially for a Temporary Restraining Order ("TRO"), which the duty judge of
   this district denied. The instant motion renews that request and moves for a preliminary injunction.
24  Because the Court substantively addresses the motion for a preliminary injunction, the motion for a
   TRO is denied as moot. (Dkt. No. 19, Renewed Application for TRO and Motion for Preliminary
25  Injunction ("Mtn.").)

26
          [2] Parties filed motions related to admissible evidence and procedure governing the
27  evidentiary hearing, which the Court addressed on the record. As stated there, those motions are
   **DENIED.** The parties also submit a joint stipulation and proposed order entering into evidence three
28  exhibits used during witness examination at the hearing. That proposed order is **GRANTED.**

United States District Court
Northern District of California

United States District Court
Northern District of California

## I.  BACKGROUND

CML alleges as follows:

CML is a "technology and software company that provides a comprehensive evaluation and management platform for AI development processes." (Mtn. at 2.) CML's software allows "customers to centrally document, analyze, and collaborate on all steps in the lifecycle of machine learning models" with "key features" that include "agentic and large language model (LLM) development, experiment tracking, model registry, dataset management, visualization tools, collaboration tools, and integration." (*Id.*) CML owns the registered trademark COMET® and has used it for over seven years. (*Id.*) As evidentiary support, plaintiff provides a copy of its registration certificates, showing the registration on the principal register. The mark itself "consists of standardized characters without claim to any particular font style, size, or color." (Dkt. No. 19-3; Declaration of Gideon Mendels, Ex. 2 at 2.) The registration was provided in Class 42, which include the following description[3]:

---

[3] Relevant here, the Court takes judicial notice of the existence of registrations for other common web browsers with which Perplexity claims to compete. Under Federal Rule of Evidence 201, a court may take judicial notice of facts "not subject to reasonable dispute" because they are either "(1) generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Public documents available with the United States Patent and Trademark Office show that some marks associated with common browsers are registered under *both* Class 42 *and* Class 9, while others are registered under only Class 9, which includes the following:

> Computer operating software, computer browsing software, namely, software for browsing the global computer network and private networks, computer software for providing access to the Internet.

The mark for "GOOGLE CHROME," for example, is registered under both. However, the following marks are registered only under Class 9: the mark for "FIREFOX" owned by Mozilla Foundation; the mark for "SAFARI" owned by Apple Inc., and the mark for "MICROSOFT EDGE" owned by Microsoft Corporation. *See* (https://tsdr.uspto.gov/documentviewer?caseId=sn85984341&docId=ORC20180401031755&linkId=9#docIndex=8&page=1; https://tsdr.uspto.gov/documentviewer?caseId=sn86071492&docId=ORC20141223003202&linkId=15#docIndex=14&page=1; https://tsdr.uspto.gov/documentviewer?caseId=sn78200789&docId=ORC20080422003545&linkId=14#docIndex=13&page=1; https://tsdr.uspto.gov/documentviewer?caseId=sn86710170&docId=ORC20160815092107&linkId=10#docIndex=9&page=1 (last accessed June 29, 2025).)

> Computer services, namely, hosting and maintaining an on-line web site and platform for others for collaboratively brainstorming, developing, managing, planning, coordinating, modifying, tracking, testing, reviewing, publishing and archiving digital computer programs including machine learning and artificial intelligence, documentation, technical, documents, contracts, sprints, stories, bugs and issues; consulting services in the field of artificial intelligence; consulting services in the field of design, selection, implementation and use of computer hardware and software systems for others; IT consulting services.

Plaintiff asserts it has used the mark continuously, "invested substantial resources in developing and promoting its business," and "developed considerable goodwill" in connection with the mark. (Mtn. at 2-3.)

Perplexity runs an eponymous AI-powered search engine and was founded in 2022 by "former 'big-tech' employees" with a current value at almost $14 billion. At the end of February, defendant announced a new product called COMET ("the browser"), "an AI-powered browser for agentic search." (*Id.* at 4.)[4] Since the announcement, Perplexity has advertised the forthcoming product on its website and the social media page of its chief executive officer (CEO), and has received media attention. (*See* Dkt. No. 19-1, Declaration of Gideon Mendels ("Mendels Decl.") ¶¶ 15-17; Dkt. Nos. 19-5 and 19-6, Mendels. Decl., Exs. 4-5.) Moreover, plaintiff asserts that the browser has launched in Beta, that certain users were given early access before the official Beta launch, and Perplexity continues to invite members of the general public to join a waitlist to use the browser.[5]

Upon hearing of the forthcoming launch, plaintiff sent a letter to Perplexity "demanding, among other things, that [it] cease and desist from its use of the COMET® Mark for a competitive

---

[4] "Agentic search refers to internet search tools that incorporate AI and/or machine learning-based agentic systems and are thereby capable of not only locating information, but of understanding instructions, performing tasks, and making decisions with minimal user input." (Mtn. at 4.)

[5] At the evidentiary hearing, Perplexity chief technology officer and founder Dzianis Yarats testified there are currently 400-500 people on the waitlist. (Transcript of Proceedings on June 25, 2025 ("Tr.") at 53:9-11.)

United States District Court
Northern District of California

United States District Court
Northern District of California

1    product." (Mtn. at 5.) Plaintiff proffers that it has a strong German presence, and has already

2    obtained a judicial cease and desist order prohibiting defendant's use of the mark in Germany.

3            Notably, Perplexity has submitted six foreign trademark applications between March and

4    May of this year (in Spain; Switzerland; the United Kingdom; the European Union; Australia; and

5    Belgium, Netherlands, and Luxembourg) that not only seek registration of the name under the Class

6    9 browser language (fn. 3, *supra*) but also Class 42. (Dkt. No. 38, Ex. 1.)

7            In response, plaintiff has filed this action, listing the following causes of action:
     - Trademark Infringement in Violation of Section 32(1) of the Lanham Act
8    - Unfair Competition and False Designation of Origin in Violation of Section 43(a) of
       the Lanham Act
9    - Unfair Business Practices in Violation of Cal. Bus. & Prof. Code § 17200 et seq.
     - Common Law Trademark Infringement and Unfair Competition.
10

11   The Court now addresses a request for injunctive relief pending trial.

12   **II.    LEGAL STANDARD**

13           "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v.*

14   *Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction

15   must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in

16   the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction

17   is in the public interest." *Id.* at 20.

18           In the Ninth Circuit, "serious questions going to the merits and a hardship balance that tips

19   sharply toward the plaintiff can support issuance of an injunction" where the plaintiff has shown

20   likelihood of irreparable harm and that the public interest favors the injunction. *All. For the Wild*

21   *Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011). That said, "[l]ikelihood of success on the

22   merits is 'the most important' factor . . . ." *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018)

23   (quoting *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017)). The plaintiff

24   must, "by a clear showing, carr[y] the burden of persuasion." *Norbert v. City and Cnty. of San*

25   *Francisco*, 10 F.4th 918, 927 (9th Cir. 2024) (emphasis in original).

26           ///

27           ///

28           ///

1    **III.    ANALYSIS**

2    **A.  Likelihood of Success**

3    The Court begins with the most important factor, likelihood of success on the merits.

4    Plaintiff acknowledges that the merits analysis rises and falls with the test for Lanham Act

5    trademark infringement. (*See* Mtn. at 8 n.5 ("Comet ML's other claims . . . require essentially the

6    same showing" as the infringement claim.).)

7    "To prevail on a claim of trademark infringement . . . a party must prove: (1) that it has a

8    protectible ownership interest in the mark; and (2) that the defendant's use of the mark is likely to

9    cause consumer confusion." *Network Automation, Inc. v. Advanced Syst. Concepts, Inc.,* 638 F.3d

10   1137, 1144 (9th Cir. 2011) (internal citation omitted).

11   **1.  *Ownership of the mark***

12   On the first prong, plaintiff notes that registration on the principal register is *prima facie*

13   evidence of a valid ownership right in the mark and the concomitant "exclusive right to use the mark

14   on the goods and services specified in the registration." (Mtn. at 8 (quoting *Automated Pet Care*

15   *Prods., LLC v. PurLife Brands, Inc*., 670 F.Supp.3d 946, 950 (N.D. Cal. 2023).) Moreover, plaintiff

16   asserts that under 15 U.S.C. Section 1065, its mark has become incontestable, which "provides the

17   mark with a conclusive presumption of validity and prevents a defense to infringement on the

18   grounds that the mark is merely descriptive." *Clamp Mfg. Co. v. Enco Mfg. Co*., 870 F.2d 512, 514

19   (9th Cir. 1989).

20   Under the statute, a mark becomes incontestable when the following conditions are met: the

21   mark has been in continuous use for five years, is still in use in commerce, there has been no

22   "adverse decision" to the owner's claim of ownership, no proceedings are currently pending

23   regarding the use of the mark, an affidavit is filed after the five-year period, and the mark is not a

24   "generic name for [] goods and services." 15 U.S.C. § 1065. CML offers into evidence its

25   registration of the mark, showing a registration date of February 19, 2019. (Dkt. No. 19-3.)

26   Perplexity does not challenge the substance of CML's claim that it owns the mark.[6]

27

28   [6] Dkt. No. 31, Perplexity's Opposition to CML's Renewed Application for TRO and Motion
     for Preliminary Injunction ("Oppo.") at 8. Perplexity notes that "it reserves the right to contest

United States District Court
Northern District of California

United States District Court
Northern District of California

1    The Court finds that CML has established a protectible ownership interest in the mark.

2        **2. Likelihood of Confusion**

3    On the second prong, likelihood of confusion, courts in the Ninth Circuit look to the eight so-

4    called *Sleekcraft* factors. *See Brookfield Commc'ns., Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036,

5    1053-54 (9th Cir. 1999). Those factors are: i) similarity of the marks; ii) the relatedness or proximity

6    of the allegedly competing products, iii) the strength of the mark, iv) the marketing channels used to

7    promote the products, v) the degree of care likely to be exercised by purchasers in selecting goods,

8    vi) the alleged infringer's intent in selecting the mark, vii) evidence of actual confusion, and viii)

9    likelihood of  expansion in the product lines. *Id*. The Court addresses each.

10                    i)    Similarity of the marks

11    "[T]he more similar the marks in terms of appearance, sound, and meaning, the greater the

12    likelihood of confusion." *Id*. at 1054. "Similarity of the marks is tested on three levels: sight, sound,

13    and meaning. Each must be considered as they are encountered in the marketplace." *AMF Inc. v.*

14    *Sleekcraft Boats*, 599 F.2d 341, 351 (9th Cir. 1979). Additionally, similarities are weighed more

15    heavily than differences. *GoTo.com, Inc. v. Walt Disney Co.,* 202 F.3d 1199, 1206 (9th Cir. 2000).

16    Here, both marks consist of the singular word "COMET." In sound and meaning, the marks

17    are identical. Yarats testified extensively as to the selection of the name due to its connotation with

18    speed, whereas plaintiff's CEO testified the name was chosen arbitrarily without consideration of its

19    meaning. (*Compare* Tr. 69:10-12, *with* Tr. 117:6-11.) The parties' motivations are not the core issue.

20    The Court finds the meaning connoted by the mark in the mind of a likely customer is the same.

21    On the question of similarity, Perplexity focuses on certain visual elements of the parties'

22    logos that differ, including color scheme, plaintiff's image of a comet appearing next to its name,

23    and Perplexity's tagline below the browser logo.  Comet ML emphasizes that in the marketplace, the

24    products are often referenced as standalone words.[7] That said, Comet ML's proffer of evidence

25

26    CML's claimed trademark validity and ownership as this case progresses," but offers no substantive

27    argument to contest ownership. (*See* Oppo. at 8 n.6.)

28        [7] Dkt. No. 36, Plaintiff's Reply ISO Renewed Application for TRO & Motion for
     Preliminary Injunction ("Reply") at 2-3 (citing Mendels Decl., Exs. 1, 3, 5).

United States District Court
Northern District of California

suggests otherwise.  Comet ML provides screenshots, for example, from its own website, where a user is likeliest to see the distinctive features of plaintiff's logo, and from Perplexity's X (formerly Twitter) account, where even standalone references to the mark appear directly below the account name "@perplexity_ai" or the account of Perplexity's CEO, where Perplexity's distinct color scheme is apparent. These pieces of evidence do not show the mark solely as a word in commerce.

Ultimately, however, because the marks both consist of an identical word, and because the Court must weigh similarities more heavily than differences, the Court finds this factor favors the plaintiff.

ii)    Proximity of the allegedly competing products

*Network Automation* provides guidance on the relevant inquiry:

> "Related goods are generally more likely than unrelated goods to confuse the public as to the producers of the goods." *Brookfield,* 174 F.3d at 1055. "[T]he danger presented is that the public will mistakenly assume there is an association between the producers of the related goods, though no such association exists." *Sleekcraft,* 599 F.2d at 350. The proximity of goods is measured by whether the products are: (1) complementary; (2) sold to the same class of purchasers; and (3) similar in use and function.

*Id.* 638 F.3d at 1150.

". . . [G]oods or services are complementary in the sense that they might be used together." 3 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Comp. § 24:26 (5th ed. 2005).

Of all the *Sleekcraft* factors, relatedness is perhaps the one most intensely disputed between the parties. CML describes products that are "highly similar in use and function," while Perplexity argues all three subfactors demonstrate distinctiveness. (*Compare* Reply at 3, *with* Oppo. at 8.) None of the cases proffered discuss the specific situation in which two products are arguably related but explicitly distinguished from the other by Registration Class (*i.e.* here, Class 9 and Class 42).

The Court reviews the evidence. The record shows CML offers a platform with a distinct suite of functions, primarily for sophisticated customers. In declaration, Comet ML's CEO describes its offering as "a comprehensive evaluation and management platform for artificial intelligence (AI) development processes," which:

> enables its customers, such as data scientists and development teams, to centrally document, analyze, and collaborate on all steps in the lifecycle

7

United States District Court
Northern District of California

> of machine learning models, including training runs, hyperparameter optimization, metrics analysis, and model comparison. The COMET® Platform is designed to assist users in developing, testing, and monitoring AI and machine learning and agentic systems.

(Mendels Decl. ¶¶ 2-3.) In describing the key features of the platform, Mendels lists several features directed towards better understanding and improving AI systems. (*See id.* ¶ 5.)[8] At a high level, these statements demonstrate a company that caters to a targeted base of sophisticated users whose offerings serve a niche purpose.

The CML website further supports the targeted nature of the product. First, as captured in a screenshot three days before plaintiff filed the instant suit, the site prominently features CML's tagline:

> Where *AI Developers* Build: Comet provides an end-to-end model evaluation platform *for AI developers*, with best in class LLM evaluations, experiment tracking, and production monitoring.

(Plaintiff's Exhibit 5 ("PX 5") (emphasis supplied).) Mendels confirmed this tagline is "catered towards" "developers and AI developers," who comprise a "core persona" for the company. (Tr. 140:13-141:3.) Second, the site features CML's mission statement, which states the company aims "to empower *practitioners* and *teams* to achieve *business value* with AI." (Tr. 140:8-12 (emphasis supplied).) Third, the bottom of the website features text reading: "Trusted by the most innovative ML teams," underneath which are the names and logos of six large corporations.

Finally, video evidence demonstrated the same. An expert for Perplexity demonstrated the core features of the CML platform through video evidence. One, the demonstration showed that by using one core component of the CML software, MLOps, a customer "[i]n the process of building an ML or AI model" could conduct "a test run . . . [to] see how well a model variation works." (Tr. at 232:19-23 (explaining defendant's Ex. 34.001).) The test run is performed via a series of experiments, allowing a user to gauge such models along a variety of metrics. The same expert stated that the other "half of the CML platform," Opik, has "[v]ery similar . . . functionality" as

---

[8] Mendels further identified and demonstrated for the Court one of CML's most popular features called "playground," which he described as "allow[ing] users to query AI models, run searches within a multitude of different AI providers, whether it's for casual queries or if they want to, for example, test how the response [would] differ between, for example, ChatGPT or Anthropic." (Tr. 104:24-105:5.)

United States District Court
Northern District of California

1  MLOps, but is geared more towards LLM AI, as opposed to ML systems.[9] (Tr. 237:15-16

2  (explaining defendant's Ex. 51).) This expert further testified that for an "every day user,"

3  searching for stuff," "it makes no sense " "to use an OpenAI model or ChatGPT through CML." (Tr.

4  242:16-19.) Conversely, the platform would be incredibly important for a developer seeking to test

5  how well CML's product works "with different prompts and different language models." (Tr.

6  242:21-25.) The Court agrees that the evidence supports that distinction.

7          Conversely, Perplexity seeks to launch its browser for generalized search purposes geared

8  towards the public at large. In his declaration, Yarats describes the browser as "allow[ing] ordinary

9  internet users to navigate the worldwide web," aiming to compete with "Google Chrome, Safari, and

10  Microsoft Edge," "made for the average internet user," "a general purpose web browser," and

11  allowing individuals "to accomplish everyday tasks." (Dkt. No. 32, Declaration of Dzianis Yarats

12  ("Yarats Decl.") ¶¶ 14-15.) Unlike CML's software, using the browser does not require the use of an

13  API key, making it fully accessible for free to the public. (Tr. 188:6-16.)[10] Perplexity further asserts,

14  and CML does not successfully refute, that unlike CML's software, the browser "is not a tool that

15  allows for seamless team collaboration and sharing insight and optimizing work flows." (Tr. 189:18-

16  21.)[11] Perplexity's expert states in his declaration that the browser "is (primarily) a competitor to

17  Google Chrome and other available web browsers (e.g., Safari, Microsoft Edge, etc.)." (Dkt. No. 33,

18  Declaration of Erich Joachimsthaler ("Joachimsthaler Decl.") ¶ 39.) In sum, the evidence reveals

19  that both products rely on machine learning to accomplish various tasks, but are ultimately distinct

20  on each of the three subfactors listed above.

21

22  _____

23          [9] LLM stands for "language learning models," while ML systems stands for Machine

24  Learning systems. (Tr. 22:14, 77:3-4.)

25          [10] At the hearing, testimony stated that an API key functions like "a password," and most

26  companies require payment to obtain one. (Tr. 173:6, 174:8-13.)

27          [11] Mendels agreed with this statement in deposition, but not on the stand at the hearing. The
Court need not decide the matter at this juncture. Rather, plaintiff seeks extraordinary relief, and the

28  Court notes the inconsistency only to demonstrate that plaintiff fails to meet its high burden on this
point.

United States District Court
Northern District of California

CML offers several arguments to the contrary, none of which persuades. *First*, Mendels testified that in his view, the browser "is really an agentic AI tool that can also browse pages versus a browser like Chrome." (Tr. 123:15-17.) The implication is that the agentic features are the primary purpose behind the product, with the browsing capabilities secondary to those. The evidence, however, demonstrates the opposite, that is, the browser is intended *primarily* to browse the internet in a manner similar to Chrome. The agentic features appear to be in service of that function, and are therefore not secondary as Mendels believes.

*Second*, CML argues that both products "are in the same general field of agentic search" and "are grounded in machine learning." (Mtn. at 11.) The evidence proffered, however, suggests that terms like "AI" and "machine learning" have become so broad to encompass a wide range of capabilities. The industry may still be in relative nascency, but it is not so niche as to automatically entitle plaintiff to prohibit another player in the field from use of the mark on the sole basis of a competitor's reliance on some AI capabilities. Mendels himself stated that "things change, especially in the AI industry, very fast." (Tr. 148:20-21.) As the field grows, so too do the varied uses for multiple products using machine learning.

*Third*, CML offered evidence at the hearing that both products can perform identical tasks and that some crossover in functionality exists. For instance, CML offered evidence of a search ran through CML's Opik software as an example of its ability to perform agentic search. (Plaintiff's Ex. 6.) The Court does not doubt that both products are capable of performing certain discrete identical functions. In the context of the analysis for likelihood of confusion, however, plaintiff fails to rebut the evidence that any such functions are *in service of* the distinct purposes for which the products are made.[12]  Whether they may be "complementary" for purposes of trademark law is debatable.

*Fourth*, CML points the Court to its "free tier" offerings and the fact that anyone can sign up to use its products, which it analogizes to the browser's focus on the general public. The weight of

---

[12] Defendant also rebuts the factual assertion that CML's software is capable of agentic search, calling the claim "misleading," because rather than perform such searches itself, "CML is a platform that lets one evaluate someone else's agentic search functionality." (Tr. at 238:3-12.) Given the current record, defendant appears to be correct.

the evidence does not show that CML targets the public generally or that its product is meant to reach everyone. That certain free versions of its products are available does not change this conclusion.

For the reasons stated above, the Court finds on the evidence provided that while some similarities exist, the products as currently designed and situated in the marketplace are not similar in use and function. Further, the plaintiff's target class of purchasers is only a sophisticated subset of the larger general public.

iii)   Strength of the mark

"The stronger a mark—meaning the more likely it is to be remembered and associated in the public mind with the mark's owner—the greater the protection it is accorded by the trademark laws." *Brookfield,* 174 F.3d at 1058. The Court looks at both the conceptual and commercial strength of the mark, the former depending "largely on the obviousness of its connection to the good or service to which it refers," *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1033 (9th Cir. 2010), and the latter depending on "actual marketplace recognition," *Brookfield*, 174 F.3d at 1058.

Here, again, the evidence is mixed. Mendels testified that the mark was selected arbitrarily and for its memorability. (Tr. 117:6-11.) He further testified that to his knowledge, no other tool named Comet existed seven years ago when CML's founders chose the mark. (Tr. 117:13-16.) Mendels further offers in declaration that CML "has approximately 17,000 followers on LinkedIn; 15,000 followers on X; 244 followers on Facebook; and 1,300 subscribers on YouTube" in addition to identifying leading news sources recognizing the company's achievements. (Mendels Decl. ¶¶ 8-9.) Lastly, he states:

> Since its founding in 2017, the COMET® Platform has supported more than 5,000 organizations worldwide, including leading companies and academic institutions, in the development and optimization of AI applications. Comet ML has generated significant revenue under the COMET® Mark, with approximately 70% of its revenue deriving from U.S. customers.

(*Id*. ¶ 11.)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

Perplexity relies on findings from its expert, Dr. Joachimsthaler to attack the mark as weak. Dr. Joachimsthaler identified several other companies, some of which use AI, whose name involves the word "Comet." (*See* Joachimsthaler Decl. ¶ 45.) CML rebuts this by noting the identified brands present inapt comparisons for a variety of reasons: either because they do not rely on AI, are not based in the United States, or offer vastly different products from CML. (*See* Dkt. No. 39, Reply Declaration of Gideon Mendels ("Mendels Reply Decl.") ¶¶ 23-28.) Dr. Joachimsthaler further rebuts the significance of plaintiff's other brand strength metrics, noting that other companies of comparable size have either spent much more time and money building and protecting their brands and that CML's online and social media presence is smaller and weaker than plaintiff maintains. (Joachimsthaler Decl. ¶¶ 48-51.) Ultimately, neither side had sufficient time to develop this issue.

Given the current record, the Court finds the factor favors CML. The Court is convinced by plaintiff's showing that it has spent the last seven years building a reputation and garnering a customer base that uses its products. However, the Court finds that the market in which the goodwill and recognition has been built is more limited than the entire AI space which plaintiff argues it occupies. In accordance with the products it offers, the Court finds plaintiff's mark is relatively strong among the sophisticated users it targets.[13]

iv)    Marketing channels

"Convergent marketing channels increase the likelihood of confusion." *Sleekcraft,* 599 F.2d at 353.  "If the 'general class' of purchasers of the respective products of the parties is the same, confusion is more likely." *Stark v. Diageo Chateau & Est. Wines Co.*, 907 F.Supp.2d 1042, 1057 (N.D. Cal. 2012) (quoting *id.*). However, "this factor becomes less important when the marketing channel is less obscure . . . and the shared use of a ubiquitous marketing channel does not shed much light on the likelihood of consumer confusion." *Network Automation*, 638 F.3d at 1151.

---

[13] CML identifies authority that commercial strength need not be considered at the preliminary injunction stage. *See Network Automation*, 638 F.3d at 1150. Though the Court agrees it is less important than certain other factors, as explained in its analysis below, the Court deems it appropriate to take note of certain evidence related to this factor, given that, following the retention of two experts and a full day evidentiary hearing, the record here is more fulsome than most other instances in which courts are called upon to rule on motions for emergency relief.

1    In addition to focusing on the overlap between the parties' customer bases, CML argues that

2    "where, as here, the defendant's media exposure is so 'widespread' and 'massive' that it can be

3    expected to 'permeate[] virtually every marketing channel,' this factor favors the plaintiff even if it

4    is unlikely that a consumer would ever encounter the products in precisely the same marketing

5    channel." (Mtn. at 11-12 (quoting *Masters Software, Inc. v. Discovery Commc'ns, Inc.*, 725 F. Supp.

6    2d 1294, 1299, 1305 (W.D. Wash. 2010).) Perplexity, for its part, highlights the differences in

7    customer bases and argues that "internet advertising alone merits little weight." (Oppo. at 12.)

8         The evidence shows significant overlap–even if not perfect convergence–between the

9    marketing and distribution channels used by the parties and that most channels used are ubiquitous.

10   (*Compare* Tr. 57:17-59:19, 86:9-22; Plaintiff's Exhibit 74, *with* Tr. 121:2-16; Mendels Reply Decl.

11   ¶¶ 20 (noting similar reliance on the internet and social media, but that only Perplexity relies on

12   Github and AWS Marketplace).) The ubiquity of the internet and social media tends to decrease the

13   salience of this factor. That said, given the overlap–even if not perfect synonymity–in the parties'

14   customer base, one would assume that the AI developers and sophisticated AI enthusiasts CML

15   targets are among the class of people interested in the browser. CML is also correct that Perplexity's

16   relative size gives it some opportunity to flood certain marketing channels. Thus, though this factor

17   is of comparatively lesser importance, it minorly favors plaintiff.

18              v)    Degree of care

19        "In analyzing the degree of care that a consumer might exercise in purchasing the parties'

20   goods, the question is whether a 'reasonably prudent consumer' would take the time to distinguish

21   between the two product lines." *Surfvivor Media, Inc. v. Survivor Productions*, 406 F.3d 625, 634

22   (9th Cir. 2005) (quoting *Brookfield*, 174 F. 3d at 1060).

23        The Court's analysis above as to CML's targeted base leads to the conclusion that CML's

24   customers are likely to exercise a degree of care allowing them to distinguish between the products.

25   (*Cf*, Tr. 119:17-19 (Mendels, saying CML "focus[es] on AI enthusiasts, which is people who are

26   excited about AI, want to use AI, interact with different models").)

27        Though CML points to case law holding that the degree of care analysis should focus on the

28   least sophisticated consumer, the evidence shows that CML's products, and thus the customers it

1    targets, are likely to understand the differences between the two products.  This factor favors

2    defendant.

3                              vi)      Intent

4         ". . . [W]here the alleged infringer adopted [a] mark with knowledge, actual or constructive,

5    that it was another's trademark" the "factor favors the plaintiff."  *Brookfield*, 174 F.3d at 1058. The

6    intent factor "is only relevant to the extent that it bears upon the likelihood that consumers will be

7    confused by the alleged infringer's mark." *Id*. at 1059. "When considering forward confusion,

8    [courts] ask whether defendant in adopting its mark intended to capitalize on plaintiff's good will,"

9    whereas in a reverse confusion case, the court "may consider several indicia of intent." *Marketquest*

10   *Grp., Inc. v. BIC Corp.*, 862 F.3d 927, 934 (9th Cir. 2017) (internal cites omitted). Finally, "when an

11   alleged infringer knowingly adopts a mark similar to another's, courts will presume an intent to

12   deceive the public." *Stark*, 907 F. Supp.2d. at 1063 (internal cites omitted).

13        Here, at a minimum, defendant is on constructive notice of plaintiff's mark.  At the hearing,

14   Yarats testified that before selecting the name, he searched for other companies with Comet in the

15   name, found several he did not believe to be relevant, and also found Comet ML. (Tr. 14:24-16:10.)

16   Finally, plaintiff offers into evidence applications for the mark "Comet" in several foreign

17   jurisdictions that Perplexity filed after receiving the cease and desist, and notes the absence of

18   applications for the mark in the United States, where CML is registered. (*See* Dkt. No. 38,

19   Declaration of Diana B. Girardi ¶ 2 and Ex. 1.)

20        The Court here finds evidence of knowledge, but no evidence that defendant "intentionally

21   selected its mark to capitalize on [CML]'s goodwill or to 'palm off' its goods as that of" CML.

22   *Good Meat Project v. GOOD Meat, Inc.*, 716 F.Supp.3d 783, 802-03 (quoting *Stark*, 907 F. Supp.

23   2d at 1063). An adequate search would have put defendant on notice that CML owned the mark as

24   registered in the United States, and Yarats himself testified that he came across plaintiff's website in

25   the process of selecting the browser name. However, none of the evidence implies an intent to

26   capitalize on CML's brand recognition or good will, and thus plaintiff has met its burden only as to

27   the intent test for reverse confusion. Furthermore, intent is an intensely factual question.  Whether

28

1    Perplexity acted in good faith when it came across CML's website but felt the browser was distinct

2    remains to be decided.

3            Thus, this factor ever so slightly favors plaintiff.  Nonetheless, the Court notes that at the

4    preliminary injunction stage, this factor is of limited importance. *See Network Automation*, 638 F.3d

5    at 1153 ("Therefore, much like the proximity of the goods, the defendant's intent may be relevant

6    here, but only insofar as it bolsters a finding that the use of the trademark serves to mislead

7    consumers rather than truthfully inform them of their choice of products.")

8                            vii)    Evidence of actual confusion

9            Evidence of actual confusion can provide a strong inference that future confusion is likely,

10   though because proving actual confusion is difficult, this factor is less important at the preliminary

11   injunction stage. *Network Automation*, 638 F.3d at 1151; *see also Good Meat*, 716 F. Supp. 3d at

12   801.

13           At this early stage, parties offer conflicting evidence. Mendels states in declaration:

14           [F]ollowing the announcement of Perplexity AI's "COMET" browser,
             Comet ML's Google Search Console began showing traffic to Comet
15           ML's website from users searching for terms that clearly refer to
             Perplexity AI and its Infringing Product, such as "comet perplexity" and
16           "comet browser." Notably, the term "comet browser" had never
             previously appeared in Comet ML's search analytics, but between
17           March 1 and May 13, 2025, the term generated 330 user clicks and
             7,721 impressions of Comet ML's website—a sudden and significant
18           emergence that coincided precisely with Perplexity AI's product
             announcement and rollout. This term is now among the top queries
19           leading users to Comet ML's website. In other words, these users appear
20           to have been searching for Perplexity AI's "comet browser" but landed
             on Comet ML's website, mistakenly associating Comet ML with
21           Perplexity AI.

22   (Mendels Decl. ¶ 28.)

23

24           Perplexity's computer science expert Dr. Ungar challenges the significance of these findings

25   by arguing, *inter alia*, the actual click-through rate for users searching "comet perplexity" and

26   "comet browser" was extremely low (5.7% and 4.3%, respectively), suggesting these "users were

27   not meaningfully interacting with CML's website." (Dkt. No 34, Declaration of Dr. Lyle Ungar

28   ("Ungar Decl.") ¶ 56.) This sharply contrasts with search terms "clearly indicat[ing] an intent to find

the CML platform," such as "comet ml," cometml," and "comet opik," which yielded click-through rates above 50%. (*Id.*) Moreover, Dr. Ungar notes that the CML website "appeared, on average, as the 6th to 8th result for queries" associated with Perplexity's product, "indicating that users had to scroll past multiple more relevant results" to land on the CML website. (*Id.* ¶ 57.) Cumulatively, this evidence detracts from the likelihood that the evidence offered by Mendels shows actual confusion.

The evidence at this juncture being both sparse and subject to different interpretations, the Court finds this factor neutral.

> ### viii)    Likelihood of expansion in the product lines

"Inasmuch as a trademark owner is afforded greater protection against competing goods, a strong possibility that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing. When goods are closely related, any expansion is likely to result in direct competition." *Network Automation*, 638 F.3d at 1153 (quoting *Sleekcraft*, 599 F.2d at 354).)

Mendels's testimony spoke to deep concerns that Perplexity will expand in a manner that directly threatens CML.

> Q: Do you believe there's a risk that Perplexity will expand . . . into areas that Comet ML currently is serving?
>
> A: Yeah. I mean, I think from what I've seen online, mostly they've been shipping new products almost on a monthly basis and trying to add more and more and more functionality. And also, if I look at some of our shared competitors, you know, companies like Microsoft that offer the Edge browser also offer, you know, MLOps, machine learning operations capabilities. And Google, for example, obviously, [has] the Chrome browser, but then they have Verdix AI, which does a lot of what we do on the MLOps side. So–and they seem to be communicating that they are planning to be bigger than Google and take down Google. So I wouldn't–I think they're definitely going to expand. That's a trajectory we've seen so far.

(Tr. 122:7-21.)

Yarats, conversely, testified that there are no current plans to use the Comet mark outside the context of the browser. (Tr. 64:3-65:18.) The Court is not convinced.  When pressed, Yarats equivocated.  He stated only that he did not personally know of any such plans, but could not confirm the company had none. (Tr. 64:8-65:4 (Yarats stating in response to a direct question from

1   the Court about possible expansion that he "cannot predict the future.").)  Further, as noted above,

2   even though Perplexity argues here that it only intends to use the name for browser purposes, in

3   Europe, it has applied for registrations both under the browser class (class 9) and the broader class

4   for which CML has a registration (class 42).

5          As explained above, the Court finds the browser as currently situated does not overlap much

6   with CML's offerings. That said, CML is reasonable in its concern that a company of Perplexity's

7   size and with Perplexity's resources will likely seek expansion where it can. The fear that a future

8   product, or modification to the browser, will bear the Comet mark and infringe on CML's domain, is

9   therefore well-founded.

10         As explained further below, the Court therefore finds this factor strongly favors plaintiff as it

11  pertains to Perplexity's future offerings.

12                     **3.    Synthesis**

13         Accounting for the totality of the *Sleekcraft* analysis is a nuanced endeavor. The factors

14  themselves are not exhaustive, and they are meant to serve the Court in answering the decisive

15  question of likelihood of confusion. Moreover, the Court is aware that evidence is limited at this

16  stage; it will be for a jury to decide the ultimate questions of fact animating this dispute.

17         Plaintiff convincingly presents evidence that it has dedicated significant time and effort in

18  building a brand that is entitled to protection. That brand, however, is not as broad as plaintiff

19  argues. CML caters to a sophisticated clientele seeking to use its products for rather specific

20  purposes in the ever-growing field of artificial intelligence. The protection to which it is entitled

21  must be decided in the context of the "actual marketplace recognition" to which it has dedicated

22  itself. *See Brookfield*, 174 F.3d at 1058. By contrast, Perplexity seeks to launch a browser that will

23  cater to the general public and serve rather different purposes. As to this product in particular, the

24  Court finds plaintiff does not show a likelihood of confusion.

25         That said, the Court shares plaintiff's concern as to Perplexity's possible expansion. Yarats's

26  testimony did little to assuage the Court's concern that Perplexity, in seeking to become an AI

27  juggernaut, will avoid taking advantage of the mark in the future and thereby infringe on plaintiff's

28

United States District Court
Northern District of California

corner of the market. At least for the pendency of this action, the Court will ensure Perplexity does not do so.

### B. Irreparable Harm

In the context of a preliminary injunction for trademark infringement, the irreparable harm showing closely tracks the merits analysis. *See Brookfield*, 174 F. 3d at 1066 ("Having concluded that Brookfield has established a likelihood of success on the merits of its trademark infringement claim, we analyze the other requirement for preliminary injunctive relief inquiry, irreparable injury. Although the district court did not address this issue, irreparable injury may be presumed from a showing of likelihood of success on the merits of a trademark infringement claim.").

The Court's findings are dependent on the marketplace. On the one hand, the Court finds that plaintiff fails to show irreparable harm is likely to flow from the launch of the browser itself. By contrast, the Court will presume injury would occur were Perplexity to expand its use of the mark beyond the browser.

### C. Balance of the Equities

So too, here, the equities analysis flows directly from the above. An injunction barring the launch of Perplexity's browser would pose hardship for defendant, but absent plans to use the mark for any other purpose, there would be no hardship in holding Perplexity to the statements it has made under oath several times now not to do so.

Conversely, having failed to show a likelihood of success as to confusion from the browser's launch itself, CML will suffer no great hardship should defendant proceed on that narrow basis.

Ultimately, as this Court has previously found, "the harm from an erroneously issued, widespread injunction far outweighs any harm should such relief be erroneously denied." *Stark*, 907 F.Supp.2d at 1067.

### D. Public Interest

"Preventing consumer confusion serves the public interest and there is a strong policy in favor of protecting rights to trademarks." *Id*. Because the potential for confusion is limited to the

corner of the artificial intelligence market occupied by CML, the public interest is served by an injunction preventing Perplexity from using the Comet mark in that area.

///

///

## IV.    CONCLUSION

For the reasons set forth above, the Court will **GRANT IN PART** CML's request for a preliminary injunction.

Defendant Perplexity AI, Inc. and its officers, agents, employees, representatives, partners, joint venturers, and/or anyone acting on behalf of or in concert with defendant (including, but not limited to, Aravind Srinivas), are hereby preliminarily **ENJOINED** and **RESTRAINED**, pending final resolution of this case, from

    i.    Using the trademark COMET, or any similar variations thereof, and any stylized marks comprising or containing the term "Comet," in connection with the marketing, advertising, promotion, distribution, and/or sale of any goods and/or services whose primary function is to perform any of the following services, which appear on plaintiff's trademark registration certificate, as follows:

Computer services, namely, hosting and maintaining an on-line web site and platform for others for collaboratively brainstorming, developing, managing, planning, coordinating, modifying, tracking, testing, reviewing, publishing and archiving digital computer programs including machine learning and artificial intelligence, documentation, technical, documents, contracts, sprints, stories, bugs and issues; consulting services in the field of artificial intelligence; consulting services in the field of design, selection, implementation and use of computer hardware and software systems for others; IT consulting services;

    ii.    Using any false designation, description, or representation, or otherwise engaging in conduct that is likely to create an erroneous impression that one party is affiliated, connected, or associated with the other party, and/or that one party's goods and/or services originate with, or are sponsored or approved by, the other party, including, but not limited to, any use on the website

United States District Court
Northern District of California

19

1     https://www.perplexity.ai/comet, the X accounts https://x.com/perplexity_ai and
2     https://x.com/AravSrinivas, and any other websites and social media accounts
3     within defendant's possession, custody, or control; and

    iii.     Directly and specifically targeting, advertising, or promoting the Browser Product
    to software engineers and data scientists working in machine learning, artificial
    intelligence, or model development roles.

    iv.     Further, defendant **shall** ensure that the webpage **perplexity.ai/comet**, and any
    other webpages owned or controlled by defendant, that permit a user to download
    or install the Browser Product will contain language that would sufficiently
    indicate to a reasonable person that the Browser Product is made available by
    Perplexity.

    Issuance of this preliminary injunction does not enjoin the defendant from launching a browser for providing access to the internet. More specifically, defendant:

    i.     may continue to use the trademark COMET and any stylized marks
    comprising or containing the term "Comet" in connection with beta testing,
    developing, launching, offering, marketing, promoting, advertising, selling and
    supporting Defendant's internet web browser product (in desktop or mobile
    format), including any integration on the browser itself with defendant's
    Perplexity artificial intelligence capabilities (the "Browser Product").

    The Court finds that given its split decision, the issuance of a bond is unnecessary.

    This terminates Docket Nos. 19, 60, 61, 62, 63, & 71.

    IT IS SO ORDERED.

Date: June 30, 2025

                       YVONNE GONZALEZ ROGERS
               UNITED STATES DISTRICT COURT JUDGE